## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSE RAM,<br><br>               Plaintiff,<br><br>   v.<br><br>CORE-MARK HOLDING COMPANY, INC., STUART W. BOOTH, GARY F. COLTER, HARVEY L. TEPNER, RANDOLPH I. THORNTON, LAURA FLANAGAN, SCOTT E. MCPHERSON, ROCKY DEWBRE, ROBERT G. GROSS, AND DIANE RANDOLPH,<br><br>               Defendants. | Civil Action No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Jose Ram ("Plaintiff") by and through his undersigned attorneys, brings this action on behalf of himself, and alleges the following based upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (a) review and analysis of public filings made by Core-Mark Holding Company, Inc. ("Core-Mark" or the "Company") and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on the Company's website concerning the Company's public statements; and (d) review of other publicly available information concerning Core-Mark and the Defendants.

## SUMMARY OF THE ACTION

1.      This is an action brought by Plaintiff against Core-Mark and the Company's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed merger of the Company and Performance Food Group Company and its affiliates ("PFG").

2.      On May 17, 2020, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") with PFG.  Pursuant to the terms of the Merger Agreement the Company's shareholders will have the right to receive: (i) 0.44 shares of PFG common stock; and (ii) $23.875 in cash per share of Core-Mark they own (the "Merger Consideration").

3.      On July 14, 2021, in order to convince the Company's shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading proxy statement with the SEC (the "Proxy Statement"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Core-Mark and the Board for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.  Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Core-Mark shareholders before the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Defendants' violations of the Exchange Act.

**JURISDICTION AND VENUE**

5.      This Court has subject matter jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act, 15 U.S.C § 78aa, and 28 U.S.C. § 1331, as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

6.      This Court has personal jurisdiction over all of the Defendants because each is either a corporation that conducts business in, solicits shareholders in, and/or maintains operations within, this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

**THE PARTIES**

8.      Plaintiff is, and has been at all times relevant hereto, the owner of Core-Mark shares.

9.      Defendant Core-Mark is incorporated under the laws of Delaware and has its principal executive offices located at 1500 Solana Boulevard, Suite 3400, Westlake, Texas 76262.  The Company's common stock trades on the NASDAQ under the symbol "CORE."

10.      Defendant Stuart W. Booth ("Booth") is and has been a Core-Mark director at all times during the relevant time period.

11.      Defendant Gary F. Colter ("Colter") is and has been a Core-Mark director at all times during the relevant time period.

12.     Defendant Harvey L. Tepner ("Tepner") is and has been a Core-Mark director at all times during the relevant time period.

13.     Defendant Randolph I. Thornton ("Thornton") is and has been a Core-Mark director at all times during the relevant time period.

14.     Defendant Laura Flanagan ("Flanagan") is and has been a Core-Mark director at all times during the relevant time period.

15.     Defendant Scott E. McPherson ("McPherson") is and has been the President, Chief Executive Officer ("CEO") and a Core-Mark director at all times during the relevant time period.

16.     Defendant Rocky Dewbre ("Dewbre") is and has been a Core-Mark director at all times during the relevant time period.

17.     Defendant Robert G. Gross ("Gross") is and has been a Core-Mark director at all times during the relevant time period.

18.     Defendant Dian Randolph ("Randolph") is and has been a Core-Mark director at all times during the relevant time period.

19.     Defendants Booth, Colter, Tepner, Thornton, Flanagan, McPherson, Dewbre, Gross, and Randolph are collectively referred to herein as the "Individual Defendants."

20.     The Individual Defendants, along with Defendant Core-Mark, are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

21.     Core-Mark is one of the largest marketers of fresh, food and broad-line supply solutions to the convenience retail industry in North America. Founded in 1888, Core-Mark

offers a full range of products, marketing programs and technology solutions to approximately 40,000 customer locations in the U.S. and Canada through 32 distribution centers (excluding two distribution facilities the Company operates as a third-party logistics provider). Core-Mark services traditional convenience stores, grocers, drug stores, mass merchants, liquor and specialty stores, and other stores that carry convenience products.

### The Company Announces the Proposed Transaction

22.     On May 18, 2021, the Company jointly issued a press release announcing the Proposed Transaction.  The press release stated in part:

> RICHMOND, Va. & WESTLAKE, Texas--(BUSINESS WIRE)--Performance Food Group Company (PFG) (NYSE: PFGC) and Core-Mark Holding Company, Inc. (Core-Mark) (NASDAQ: CORE) today announced that they have entered into a definitive agreement pursuant to which PFG will acquire Core-Mark in a stock and cash transaction.
>
> Under the terms of the transaction, which has been unanimously approved by the Board of Directors of each company, Core-Mark shareholders will receive $23.875 per share in cash and 0.44 PFG shares for each Core-Mark share. The transaction values Core-Mark at approximately $2.5 billion, including Core-Mark's net debt. Upon closing of the transaction, Core-Mark shareholders will own approximately 13% of the combined company. Core-Mark expects to continue paying its current quarterly dividend through the completion of the transaction.
>
> The transaction will create a best-in-class convenience business within PFG's Vistar segment that will include the Core-Mark and Eby-Brown businesses. The expanded convenience business will operate under the Core-Mark brand and will be headquartered in Westlake, Texas with Eby-Brown maintaining ongoing operations in Naperville, Illinois. Scott McPherson will continue in his role as President and Chief Executive Officer of Core-Mark, following closing of the transaction. Tom Wake will continue as President and Chief Executive Officer of Eby-Brown, reporting to Mr. McPherson.
>
> The transaction will create a best-in-class convenience business within PFG's Vistar segment that will include the Core-Mark and Eby-Brown businesses. The expanded convenience business will operate under the Core-Mark brand and will be headquartered in Westlake, Texas with Eby-Brown maintaining ongoing operations in Naperville, Illinois. Scott McPherson will continue in his role as

President and Chief Executive Officer of Core-Mark, following closing of the transaction. Tom Wake will continue as President and Chief Executive Officer of Eby-Brown, reporting to Mr. McPherson.

"We are excited to announce the strategic acquisition of Core-Mark and welcome the organization to Performance Food Group," said George Holm, PFG Chairman, President & Chief Executive Officer. "Core-Mark is an outstanding company that we believe will significantly strengthen our business diversification and expansion into the convenience store channel. Core-Mark brings a highly skilled and experienced workforce along with an experienced senior leadership team, which will be valuable additions to the PFG family of companies. This transaction will also combine Core-Mark's footprint and operational excellence with PFG's existing capabilities in both convenience and foodservice. The deal comes with strong strategic and financial merits which we believe will generate significant customer benefits and help PFG continue to create long term shareholder value. The two organizations have similar cultures, which we expect will facilitate a smooth integration and transition process. We look forward to getting to know the associates at Core-Mark better and building a strong future as one organization."

"On behalf of PFG's Vistar segment, I echo George's enthusiasm for this transaction," said Patrick Hagerty, Executive Vice President of PFG and Chief Executive Officer of Vistar. "Adding convenience store distribution in 2019 built up the core strength of our organization, providing another important avenue for growth. Bringing Core-Mark to PFG will continue this journey and complement our existing portfolio. I look forward to us bringing together the best talent in convenience and welcoming Core-Mark associates at close."

Core-Mark is one of the largest wholesale distributors to the convenience retail industry in North America with approximately $17 billion in net sales. The company has approximately 7,500 employees and operates 32 distribution centers across the United States and Canada. Core-Mark services approximately 40,000 customer locations in all 50 states in the U.S., five Canadian provinces and two Canadian territories.

"This transaction brings together two companies known for their customer-focused approach and dedication to their employees," said Scott McPherson, Core-Mark President and Chief Executive Officer. "As part of our continuous focus to maximize shareholder value and better serve our customers, our Board evaluated the transaction and determined this combination provides our investors immediate value and the opportunity to participate in the upside potential of being part of a larger, diversified and customer-centric supplier in the foodservice and convenience retail industry. The combination of our two highly complementary businesses creates an even stronger platform to drive growth, as we deliver a best-in-class offering to our customers. I'd like to thank the entire Core-Mark team for their hard work and focus in helping us reach this exciting milestone."

Upon closing of the transaction, at least one current Core-Mark director will be added to the PFG Board of Directors.

**Compelling Strategic and Financial Benefits**

- **Accelerates PFG's diversification and adds highly complementary assets in the convenience store channel:** With the closing of this transaction, PFG will add approximately $17 billion of net sales, resulting in total PFG pro-forma LTM net sales of approximately $44 billion.

- **Adds complementary customer-centric operating model:** Core-Mark brings a consistent go-to-market approach with a selling culture focused on customer success.

- **Enhances attractive customer base and product offerings:** The transaction builds upon PFG's current foodservice focus within the convenience channel adding additional customers and product offerings, particularly in the fresh food space.

- **Strong strategic and financial merits:** The transaction is expected to be accretive to Adjusted Diluted EPS in the first full fiscal year following the close. The accretion calculation does not include any of the expected cost synergies.

- **Annual run-rate net cost synergies of approximately $40 million expected to be achieved by the third full year after closing.**

**Transaction Financing**

The transaction is not conditioned on financing. PFG expects to fund the cash portion of the transaction consideration with borrowing from its asset-based revolving credit facility and the issuance of new senior unsecured notes.

**Timing and Approvals**

The transaction is expected to close in the first half of calendar 2022, subject to U.S. federal antitrust clearance, Core-Mark shareholder approval, and other customary closing conditions. The transaction is not subject to PFG shareholder approval.

**Advisors**

BMO Capital Markets Corp. acted as the exclusive financial advisor to PFG, and J.P. Morgan Securities LLC provided a fairness opinion to the Board of Directors of PFG. Skadden, Arps, Slate, Meagher & Flom LLP acted as legal counsel to

PFG. Barclays acted as the exclusive financial advisor to Core-Mark. Weil, Gotshal & Manges LLP acted as legal counsel to Core-Mark.

### FALSE AND MISLEADING STATEMENTS
### AND/OR MATERIAL OMISSIONS IN THE PROXY STATEMENT

23.    On July 14, 2021, the Company authorized the filing of the Proxy Statement with the SEC.  The Proxy Statement recommends that the Company's shareholders vote in favor of the Proposed Transaction.

24.    Defendants were obligated to carefully review the Proxy Statement prior to its filing with the SEC and dissemination to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy Statement misrepresents and/or omits material information that is necessary for the Company's shareholders to make informed decisions regarding whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### Material False and Misleading Statements or Material
### Misrepresentations or Omissions Regarding the Company's Financial Projections

25.    The Proxy Statement contains projections prepared by the Company's management concerning the Proposed Transaction, but fails to provide material information concerning such.

26.    The SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[1]  Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new

---

[1] *See, e.g.*, Nicolas Grabar and Sandra Flow, Non-GAAP Financial Measures: The SEC's Evolving Views, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measuresthesecs evolving-views/; Gretchen Morgenson, Fantasy Math Is Helping Companies Spin Losses Into Profits, N.Y. Times, Apr. 22, 2016, available at

and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[2] One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts.

27.    In order to make management's projections included in the Proxy Statement materially complete and not misleading, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.

28.    Specifically, with respect to the Company's projections, the Company must disclose the line item projections for the financial metrics that were used to calculate the non-GAAP measures, including: (i) Adjusted EBITDA; (ii) Adjusted EBIT; (iii) Adjusted Ebit (including Stock-Based Compensation Expense); (iv) Net Operating Profit After Tax; and (v) Unlevered Free Cash Flows.

29.    Disclosure of the above information is vital to provide investors with the complete mix of information necessary to make an informed decision when voting on the Proposed Transaction.   Specifically, the above information would provide shareholders with a better understanding of the analyses performed by the Company's financial advisor in support of its opinion.

---

http://www.nytimes.com/2016/04/24/business/fantasy-mathis-helping-companies-spin-ossesinto-profits.html?_r=0.

[2] Non-GAAP Financial Measures, Compliance & Disclosure Interpretations, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), *available at* https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

**Material False and Misleading Statements or Material
Misrepresentations or Omissions Regarding Barclays' Financial Opinion**

30.     The Proxy Statement contains the financial analyses and opinion of Barclays Capital Inc. ("Barclays") concerning the Proposed Transaction, but fails to provide material information concerning such.

31.     With respect to Barclays' *Selected Comparable Company Analysis – Core-Mark*, the Proxy Statement fails to disclose the individual multiples and metrics for the companies observed by Barclays in the analysis.

32.     With respect to Barclays' *Selected Comparable Company Analysis – PFG*, the Proxy Statement fails to disclose the individual multiples and financial metrics for the companies observed by Barclays in the analysis

33.     With respect to Barclays' *Selected Precedent Transaction Analysis*, the Proxy Statement fails to disclose the individual multiples and metrics for the transactions observed by Barclays in the analysis.

34.     With respect to Barclays' *Discounted Cash Flow Analysis – Core-Mark*, the Proxy Statement fails to disclose: (i) Core-Mark's terminal values; (ii) the line items used to calculate the Core-Mark's unlevered free cash flows; (iii) the basis underlying Barclays' use of the perpetuity growth rates ranging from 1.75% to 2.25%; (iv) the inputs and assumptions underlying Barclays' use of the discount rate range of  7.5% to 8.5%; (v) the number of fully diluted outstanding shares of Company common stock; and (vi) the weighted average cost of capital for the Company.

35.     With respect to Barclays' *Discounted Cash Flow Analysis – PFG*, the Proxy Statement fails to disclose: (i) the terminal values of Performance; (ii) the line items used to calculate PFG's unlevered free cash flows; (iii) the basis underlying Barclays' use of the

perpetuity growth rates ranging from 2.25% to 2.75%; (iv) the inputs and assumptions underlying Barclays' use of the discount rate range of 7.5% to 8.5%; (v) the number of fully diluted outstanding shares of PFG common stock; and (vi) the weighted average cost of capital for Performance.

36.     With respect to Barclays' *Research Analysts Price Targets Analysis for Core-Mark and PFG*, the Proxy Statement fails to disclose the price targets observed as well as the sources thereof.

37.     With respect to Barclays' *Premiums Paid Analysis*, the Proxy Statement fails to disclose the premiums paid in the transactions.

38.     When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.  Moreover, the disclosure of projected financial information is material because it provides shareholders with a basis to project the future financial performance of a company and allows shareholders to better understand the financial analyses performed by the Company's financial advisor in support of its fairness opinion.

39.     Without the above described information, the Company's shareholders are unable to cast a fully informed vote on the Proposed Transactions.  Accordingly, in order to provide shareholders with a complete mix of information, the omitted information described above should be disclosed.

### COUNT I

**(Against All Defendants for Violations of Section 14(a)
of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

40.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

41.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

42.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that communications with stockholders in a recommendation statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

43.     Defendants have issued the Proxy Statement with the intention of soliciting shareholders support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Proxy Statement, which fails to provide critical information regarding, among other things, the financial projections for the Company.

44.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or

omitted from the Proxy Statement, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

45.     The Defendants knew or were negligent in not knowing that the Proxy Statement is materially misleading and omits material facts that are necessary to render it not misleading. The Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

46.     The Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy Statement, rendering the sections of the Proxy Statement identified above to be materially incomplete and misleading. Indeed, the Defendants were required to be particularly attentive to the procedures followed in preparing the Proxy Statement and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

47.     The Defendants were, at the very least, negligent in preparing and reviewing the Proxy Statement. The preparation of a Proxy Statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Defendants were negligent in choosing to omit material information from the Proxy Statement or failing to notice the material omissions in the Proxy Statement upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

48.     The misrepresentations and omissions in the Proxy Statement are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

49.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### (Against the Individual Defendants for
### Violations of Section 20(a) of the Exchange Act)

50.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

51.     The Individual Defendants acted as controlling persons of Core-Mark within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Core-Mark, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

52.     Each of the Individual Defendants was provided with, or had unlimited access to, copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

53.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy Statement at issue contains the

unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

54.    In addition, as set forth in the Proxy Statement sets forth at length and described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

55.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

56.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

57.    Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.      Directing the Individual Defendants to disseminate an Amendment to the Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

C.      Directing Defendants to account to Plaintiff for all damages sustained because of the wrongs complained of herein;

D.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: August 6, 2021                                        Respectfully submitted,

                                                             By: */s/ Joshua M. Lifshitz*
                                                             Joshua M. Lifshitz
                                                             Email: jml@jlclasslaw.com
                                                             **LIFSHITZ LAW FIRM, P.C.**
                                                             1190 Broadway,
                                                             Hewlett, New York 11557
                                                             Telephone: (516) 493-9780
                                                             Facsimile: (516) 280-7376

                                                             *Attorneys for Plaintiff*